et al. Oral argument is not to exceed 15 minutes per side. John Siskopoulos, for the appellant, you may proceed. Good afternoon, John Siskopoulos. On behalf of Appellant Joshua, I'm also joined here by trial counsel Mr. Glanton, Attorney Glanton. And I just wanted to remind the court that we reserve five minutes for rebuttal. So I hope the court takes note. This is a very interesting case. It's a very sad case. I also think in some respects, it's a shocking case. Joshua Horton is an American patriot. He served our armed forces in the Navy and in the Army. He is one of those rare people nowadays that actually serves the armed forces. Many people do not. And he did it to protect us. He did it to protect our country. And in the end, at the last stages of this terrible thing that happened to him in December of 2022, nobody was there to protect him. We have a lot of spilled ink about disputed issues of fact, how the law should be analyzed and interpreted by the Sixth Circuit. And there is one thing we do agree on. Grossly inadequate care can amount to an Eighth Amendment liability violation and claim. And basically, their fallback position is, hey, we gave this guy some care. And because we have some care given to Mr. Horton, we've done enough. And I don't believe that some care qualifies as absolving themselves of Eighth Amendment liability. What they did was provide cursory care. They provided cursory care. They provided grossly inadequate care. And the man ultimately had osteomyelitis, which is a very dangerous condition in the thoracic area of your back, the upper region of your back. And this probably festered for two months. And at the end, they had all these telltale signs that this guy was going down. And for several weeks, they really did nothing of any significance except really give him a leave. And the leave is not going to cure osteomyelitis. It's just going to... Is there anything in the record as to when this condition could have been successfully treated? At what point? What was the last date, would you say, if it's in the record of when he could have been treated to avoid the paralysis? Well, several experts say that up until just before, not the week of, but just before he collapsed in the shower, that it could have been surgically addressed through a decompression of the spine and that he could have been paralyzed. What about in the record? I believe it says it was not appropriate to have surgery for him. It seems like that at some point... Oh, do you mean, I believe, the initial back surgery prior to October 2022. I believe they said he wasn't a candidate for back surgery. Okay. And that's a different type of surgery than what you're talking about? Yes. Yes. And was there a finding that it was appropriate? He could have had that kind of back surgery? The record's not clear why he was not a candidate. I cannot speculate as to why he wasn't. And what in the record, what could you point us to as to the time when he could have been treated successfully when that would have occurred? You mean for the thoracic issue, the new issue that took place? Right. I believe sometime in mid-December, not December 19th, of course not December 19th, but sometime, as a matter of fact, he told them... And where in the record would we find that? Expert opinion of Johnny Bates, Dr. Bates. Okay. And you do have a record site of where that is? Yes. Where? It's in our brief. We also talk about other experts... If you could give us that on rebuttal, that would be helpful. Sure. Okay. I also... Yes, Your Honor. I have a question about that December 8th time frame also. Does the record indicate whether Dr. Durant knew the thoracic MRI had been approved prior to prescribing pain medication? Well, he initially did order an MRI in October, and this is a dispute of fact we have. It came back as a rejection, and they asked for some additional information. Now, they said they wanted to provide an alternative treatment plan, and our site says it's a dispute of fact that he wanted to provide additional information so he could get that MRI approved. Unfortunately, it was not... He never gave additional information. He acknowledges this, and the additional MRI was scheduled, but by that time period, he was in terrible shape. I think the scheduled MRI happened much after the collapse. I think it was scheduled for late December. By that point, unfortunately, he collapsed and was found to have osteoarthritis, and unfortunately, he can no longer walk again. I couldn't find anything. There's an indication in the deposition that Dr. Durant did not know that the MRI, the one at issue here on the thoracic, had actually been approved or scheduled. Am I correct that that's what the record says? It was ultimately scheduled. I believe he had... Well, I'll try to get to that question. He had an X-ray scheduled November 30th, and then he had the X-ray that took place the first week of December. They were pretty much well aware that he had a pretty bad condition. He either had a malignancy or he had osteomyelitis. One or the other is very dangerous. At that point, the MRI was scheduled. I don't know if it was through Nurse Labonte or another nurse practitioner, but it was scheduled for the end of December. With regards to the MRI in between that, Dr. Durant, after finding out about the X-ray, which he does talk about, he does say he read the entire X-ray. He just prescribes him just a little more Aleve. With all due respect, Aleve is good if you play too many sets of tennis on a holiday weekend or play too many rounds of golf and your back is hurting you, but I don't think it's really going to cure osteomyelitis. I believe that there was a substantial risk there. Clearly, he meets the objective standard on the first prong, but I believe that the subjective standard is also met there given the circumstances and the inferences from the record. I don't believe you need to prove a smoking gun, but I think there were smoking guns here, but the inference, it's just like any kind of case where you have to look at the inferences from the record, and the inferences of the record are they knew that this condition was festering, only getting worse. I mean, in October, he says, I can't breathe. November, he says, I have a 10 out of 10 pain, which is the first time he ever said it. He reiterates it the first week of December. He says, I have a 10 out of 10 pain. He also says, please get me to the hospital. He never said that before. He says it again, and then something happens on 12-11 where there's an SCR, and the doctor says, hey, I should have gotten that SCR. I should have received that SCR, and they don't do anything. It's just the poor man just sits there, and he suffers, and the judge also, I think, gets something wrong. The judge admits in his opinion, he says that he needlessly suffered for several weeks. I think it was more like two months, but you guys have found people for liability for a few days of a person not getting surgery. You've also found it for people who had instances who suffered from withdrawal systems, and I'm not trying to make light. Can you hear me? You go ahead. Oh, no, no. So we're talking about both the nurse practitioner and the doctor here, but can you – is there one point in time as to each of them that you can – you say – argue that the defendant's conduct, individual defendant's conduct, went from being maybe just negligent, not the best of care, to deliberate indifference, such – meeting this grossly – Great. You mean reckless. Reckless. Reckless. Grossly reckless standard. Is there a point in – is it the December? The last two weeks are brutal on the reckless. I know, but is there – what point in time would you say, you know, this – we could infer, or you'd argue that the conduct crosses the line to deliberate indifference? Well – I'm just looking for a point in time, not just – I'll give two instances for the nurse and two instances for the doctor, if that's possible. Okay. In late October, he says, I can't breathe. And the nurse practitioner expert, I believe the gentleman's name is Mady, he says when a person says they can't breathe, you have to send them to the hospital. That could be a variety of issues. But when a person starts saying, I can't breathe, I can't take a full breath, that could be pneumonia. He talks about it could be pneumonia. It could be a lot of dangerous conditions that needs to be addressed. Also, Nurse Levante, in November, as I discussed before, he never told her before, I have a 10 out of 10 pain. And he's basically crying for help. I need to see a doc – I need – actually, at one point, he wants to go to the hospital. And I believe when he – we record the 10 out of 10 pain, he should have been seen by a hospital. Also, one of the – You say that? The 10 out of 10 pain? November 30th, Your Honor, I believe. At a meeting with Nurse Levante. Okay. And I believe that's in our papers as well. I could get it for you on rebuttal if you so wish. I also – with the doctor, he knew that his condition was getting worse. In his deposition testimony, he acknowledges he only kept getting worse and worse and worse. And by December, he's got the – he acknowledges reading the x-ray. He says, I did read that he might have had osteomyelitis. At that point, he should have swung into action. You've got a guy saying, I need to go to the hospital several times. I have a 10 out of 10 pain. I have difficulty walking. His cellmate reels him up and says this man needs immediate help. At that point – and the doctor says they can order emergent MRIs. That was one of the ways they could have found this condition. I also believe a blood culture earlier could have found this condition. And instead, he's just this slow-rolling train wreck. This is not a sudden development where he had a – you know, he had a stroke and they all rushed him. And this is very dangerous that they took so long. I'll reserve my five minutes for – Okay. Thank you. Good afternoon, Your Honors, and may it please the Court. Michael Bentley on behalf of Centurion of Tennessee, LLC, and the medical provider defendants in this case with me on the briefs and at council table today is my partner, Aaron Salter-Framaggio. Your Honors, deliberate indifference being an application of the Eighth Amendment's cruel and unusual punishments clause is a very high standard of culpability. It's greater than gross negligence. It's equivalent, as this Court and the Supreme Court has said, to criminal recklessness. It is not a constitutional version of medical malpractice, and it leaves questions of medical judgment to the providers providing care to patients in prisons, even if, in hindsight, an expert could identify a misdiagnosis, a better course of treatment, or a more prudent practice. I agree with you. This is a really difficult standard to meet. I think that's a fair assessment. And I think much of the briefing tended towards some of the earlier treatment. I think what was this, a period of treatment from the end of 2019 to almost the end of 2022. I don't think there's a dispute about whether there was adequate and appropriate treatment during all of the course of that. It was clearly evident that efforts were being made, tests were being run, blood was being drawn, and that that was what ended up in the diagnosis of degenerative disease of the spine was an appropriate diagnosis. But I think we can't leave it there, because really the issue is what happened after October of 2022, when everyone agrees on the record, the PA, the nurse, Dr. Durant, was that he was seeking treatment for a new problem, a new pain, and that was the thoracic issue. And the doctor acknowledged that it was a new issue, and he ordered the x-rays and he ordered the MRI. But it was there where I began to see, or I have my questions, and I would like a response to the record here. Because what I see is in your briefing there is a lot of discussion about the older treatment and about maybe even the denial of the MRI, but there's very little said about the x-ray. And to me, the x-ray is one of the key components of this. And when the doctor found out and heard what the x-ray showed, why doesn't the presence added to the 10 on 10 pain, the request to go to the ER, the number of SCRs filed, including his knowledge of that x-ray, why isn't that the difference in this case? Yes, Your Honor, if I can address that in a couple of ways. And I guess I would start by saying I agree the brief sort of covers the entire clinical picture. Judge Anderson's opinion does that, and the district court as well. We think that's certainly informative if you're trying to analyze the subjective state of mind of these doctors who have been treating and have been with their for many years. But going straight to your question about the October 30th x-ray, the December 2nd radiology report that's read by Dr. Garant on December the 8th, and then Dr. Garant meets with Mr. Horton. And he knows at this point that he and nurse they requested an MRI, got a utilization management request to try an alternative treatment plan. They've now implemented that. Well, that's another question. Was it an alternative treatment? I struggle with it being called an alternative treatment because, in fact, the alternative plan that he undertook at that stage he had already completed. And he had the information in his records that it had been completed. You know, just walking back through the records. Six weeks before October 18th, which is the question, in September, Dr. Garant prescribed the NSAID to Horton beginning in March 4th of 21, in November of 22, were documenting these other issues. So the times that were addressed in the MRI denial, I'm struggling to see how that could be an alternative plan when what Dr. Garant should have done was said, I've already done that. It has met everything you requested of me. And here are the records. So, Your Honor, I guess how I would respond to that is, first, I would say, now, even under plaintiff's theory, there's new back pain. It's gone from the cervical at the top near the neck to the mid-back pain, the thoracic area. So you've got a new complaint of pain. So you've got Dr. Garant and nurse practitioner Hendrix Labonte trying to determine what the source of this new pain is. Their request, their frontline request, is an MRI of the thoracic region. That is what the utilization management provider says, let's consider an alternative treatment plan. And to go right to that point about how to interpret UM's response, I guess I have a couple of responses. First is just textual. It starts with the abbreviation ATP. That's an alternative treatment plan. And then it says, it goes further on, either provide contraindication for or implement this three tripartite plan over the course of six weeks, which is non-steroid pain medications, exercise regimen, and activity limitations, all combined together. I don't think, I just respectfully disagree with the plaintiffs that you can find that specific alternative treatment plan having already been implemented. Now, you can look back over the course of the extensive treatment and diagnosis and care that Mr. Horton received, and you can find at times, certainly he was prescribed NSAIDs. He was, they attempted to treat his back pain through steroidal injections. They continually monitored him and diagnosed him. At one point, I mean, he got neurology consults. He received a pain management consult, a physical therapy consult, but never has a doctor said, try these three things over the course of six weeks for this particular mid-back pain, and let's see if it works. And what doctor... Wait, never has, his doctor has said that, because Durand has already done those very things. And not in the 2019 to 2000, early 22 timeframe, but in fact, from September of 22 on, he had engaged in all of those activities. So, I'm just struggling to understand why his response would not be to the second half of that, which says, please also provide documentation of the contraindications, failure of trial, failure of home exercise, and failure of activity modifications for at least six weeks. All of it, which had been accomplished during that timeframe. So, isn't there a problem with not providing that response to the request for documentation? So, Your Honor, I'm going to do my best to convince you of my view of that, but then what I'm going to do is what Judge Anderson did at the district court level, and say, even if you don't agree with me, what we've got is Dr. Garant interpreting another provider's instruction through the U.M., and he reads it to reasonably require an alternative treatment plan, which he then implements. I don't think, in this court's cases, I don't think would support a suggestion that that is deliberate indifference. But to go back to your first question, I don't see, and the plaintiffs have not pointed to, a treatment regimen that is just like this one, that another provider has now looked at the file and recommended. I agree with Your Honor. Over the course of a couple of years, you can put together at various times non-steroidal pain medication. No, it's the year in question. Well, that's correct, but... Right before the time in question. Correct. And it's a fair answer that you have a response to this, but what concerns me is, after that has occurred, we have the x-ray. And the x-ray provides, there is expert testimony in the record of what that type of x-ray, what information that gives a doctor. So, the doctor knows on the date of, what is it, the 8th, isn't it? That's correct, Your Honor. It's the 8th. He is told for the first time, he's the doctor who's been treating this gentleman across this length of time, unsuccessfully with all of these methodologies that we're talking about for the MRI, and now he has an x-ray that says, this man in the thoracic spine has a fracture, a fragmented hiptation. It's either a malignancy or an osteomyelitis. That is key information to him right there. And he then sees him the next day and goes back to the old treatment from years ago without ever responding to his already acknowledged understanding that there is a new problem, and that that new problem is located in another area, and without then treating that, why does that not rise to the level of recklessness? And this is deliberate indifference. It's not intentional. The intentionality is not a key, and it's not an accusation against the doctor. But deliberately failing to accord an x-ray that has key information for what this man is suffering, to accord it no strength and no response at all, that seems to me to be reckless. Why isn't it? So it's not, Your Honor, for a couple reasons. First, there's a key piece of information that was not included in that, and I just want to say, obviously, when Dr. Garatt meets with Mr. Horton on the 9th, the MRI that Dr. Garatt and Nurse Practitioner Levante Hendricks think is necessary has already been ordered, and it's scheduled for December the 21st. Where in the record can you show me that Dr. Garatt knew that fact when he spoke to him on the 9th? Because I'm looking at deposition testimony that says there's a, that there's, when was the MRI scheduled? And Garatt says, I don't know at the time. So that adds to the struggle for me, because if he doesn't know that it's scheduled, then how can he delay any other effective treatment? So the reason that he knows it's scheduled is because, and this is in the 1082-83, which is Dr. Folkes' sort of overview of the medical history. On November 30th, Dr. Garatt and Nurse Practitioner Levante Hendricks get together after the alternative treatment plan. They have a meeting, and they determine an MRI is needed. Now, Nurse Practitioner Yes. I'm asking about when he found out that it was scheduled and what date it was scheduled for. Well, that's a fair question, and I do not have that in front of me when he knew it was scheduled, but he certainly knew, and there's no dispute in the record, that Nurse Practitioner Hendricks Levante was ordering it on the 30th and that it ultimately was scheduled for the 21st. Was there any evidence that he knew it had been approved as of the December 9th meeting with Horton? Yes, I believe there is evidence that he knew it had been approved. I love that site, because the deposition I was looking at said, I don't know at that time. Well, I guess I would point to, let me take you directly to Dr. Garatt's deposition, 90-5, 1221 through 1223 is the critical passage. He's being questioned by plaintiff's counsel. He says that he did not, he's asking why he did not speed up the MRI, so he knows it's been requested at the very least, and he knows it's been scheduled for the 21st, and what Dr. Garatt says in 90-5, 1221 to 1223 is, based on my observation of the patient and my understanding of the x-ray, nothing had changed as far as his condition on November 30th when we decided he needed this MRI. So he knew it was scheduled, he knew it was upcoming, and that was, he testifies. Sometimes. Well, do the records reflect that? Yes, I think. Do the records reflect that nothing had changed? So the records reflect, and this is key, that's Dr. Garatt's impression of the patient and the medical records. Now, again, experts in hindsight may say, hey, Dr. Garatt got that wrong, but there's nothing that you can take away from this record to think that Dr. Garatt was failing to treat the patient, was not exercising medical judgment, or was refusing to attempt to diagnose. The record is clear that he was. Okay, any more questions? Thank you, Counsel. Thank you, Your Honors. With regards to the site, Judge Bush, that you wanted, it's in the deposition testimony of Mr. Bante, who said, I believe it's on ID number, ID number, it's document 947, ID number 2167, and he said the following, but between the 5th and the 9th, I think he still was within that window. The goal, and it talks about the goal time for any terms of decompression would have certainly been the 5th of December and before he fell, and then says it was questionable after the 9th, because at that point, it's not exactly certain if that decompression would have worked. So, as I was discussing before, the decompression would have been able to alleviate that stress on the thoracic region of his spine. With regards to one of the... Dr. Garatt read on the 8th, and you're saying that your expert testimony says that he had to have got into the hospital by the 9th, or he wouldn't have... He said, no, he said the golden time window, he said, golden time window, but can I also say that there was a question regarding opposing counsel where, did anything change? Yes, I would say something did change that Dr. Garatt and Nurse Labonte, who I believe it was the 6th, she found out that he had osteomyelitis on the x-ray. They should have done something to swing into action, and even if Dr. Garatt did not know until the 8th, his course of action doesn't show he's very much concerned. His first thing to do is to, in a knee-jerk response, give him more relief. He's not swinging into action saying, hey, we got to fix this guy, we got to take care of this guy. His first response is, hey, let's pop some more leave in this guy, and guess what? It didn't work. Of course it's not going to work. I also want to say something about... What's your best case for that, for that failure making a jury question? Well, it's in my initial brief, which unfortunately I don't have in front of me, but it talks about that the ineffective... That to continue to follow an ineffective plan is grossly inadequate care also. The Sixth Circuit discusses in another case where it says that if you simply provide pain medication or pain relievers, that is not a game plan. And let's be honest, that really... Well, that's all they were doing at the bitter end. His first knee-jerk reaction after he hears this terrible news that this guy might have osteomyelitis or malignancy. At that point, we don't know. And unfortunately, I've had family members who've passed from cancer quickly. I mean, you have to move on it. At that point, they don't know if he had cancer. If you have esophageal cancer or pancreatic cancer, you better get moving very quickly because it can change a life. And it has in my family, sometimes for the good, sometimes for the bad. They weren't sweeping into action. And also, you have to talk about some of the stuff in the overall sweep of this. I mean, he has his cellmate coming. Please help this man. The first time in his life, he's saying 10 out of 10 pain. I don't know if they zoned him out because of his previous injuries and they just said, oh, he's a chronic complainer. I don't know if that happened. But they did not do anything after November 30th when he's saying, I have a 10 out of 10 pain. I cannot breathe. Please take me to the hospital. And it's obviously getting worse and worse. Now we know, in hindsight, he has osteomyelitis. But I believe that could have been addressed much earlier. Dr. Garant knew this was a new issue in October. He knew it was a thoracic issue and it was a new issue. Is there a record as to what Dr. Garant knew about osteomyelitis as a disease and how it should be treated? He really doesn't talk about it. He seems to think it's a rare condition, but our experts say it's not exactly a rare condition. Quite frankly, it's not. It's a bacterial infection. If you get a cough in the middle of winter and that cough lingers, most doctors, if you're a certain age, will say this patient might have walking pneumonia and how you treat it is an antibiotic. I don't think this was something that was so over-the-top complex. He needed an antibiotic. This probably would have resolved this. And unfortunately, he will never walk again. I want to talk about the public policy issue about this as well. I think this case, if you have the biggest bleeding heart or if you've lost all of your bleeding heart abilities, I think either way, if you're a judge, you have to rule in our favor, and I'll tell you why. First of all, how this man suffered is absurd. This really is like a horror film at the end. And with regards to what I think other judges who may think they're not as compassionate in some ways, perhaps I said it the wrong way. If you allow people to avoid diagnostic tests, you're going to get more people in the hospital. You're going to get more big verdicts. You're going to get more people screaming for lawsuits. The diagnostic tests are important. They didn't do it here. They knew he had osteomyelitis, and for whatever reason, they didn't schedule the emergency MRI, and they should have scheduled the MRI back in October. And that's why Mr. Horton will never walk again. Thank you. Thank you. We will take the case under submission, and the clerk may adjourn the court.